The first case for argument this morning is 23-2057, CellTrust Corp. v. MyRepChat. Mr. Bright, whenever you're ready. Good morning, Your Honors. May it please the Court. I'm Chris Bright on behalf of Plaintiff Appellant CellTrust, and I will refer to Defendant Appellee as MRC or MyRepChat. Very quickly, the CellTrust patents that are at issue in this case relate to a new server that receives communications from a virtual number running on an application on a phone and processes them for sending to an electronic discovery system, an EDS, or an enterprise information archiving system, an EIA. For example, these could be text messages sent to a regulatory advisor or financial advisor that are subject to regulatory requirements. Now, there are several legal errors that the District Court made, but I'm going to try to distill them down into two essential legal errors, major issues for this appeal. The first is claim construction regarding the sending claim term, and the second is the corroboration requirement for the alleged prior use testimony by MRC's witness, Mr. Antonoff. Did you first present this claim construction argument to the Court? I just want to make sure I understand exactly how the claim construction argument may have been teed up below. Yes, understood, Your Honor. In fact, so this was an evolving issue during trial. It was not raised before trial. And actually, it was an uncertain issue during trial. And the reason I say that is both sides' experts agreed that the sending claim term was not limited to directly sending. But you're saying that it was never presented as an issue that the District Court needed to decide? Is that what you're indicating? Before trial. Before trial, that's correct, Your Honor. It was not an issue at Markman. The sending term was one of those terms that had its plain meaning, probably because it just wasn't disputed by defendants. Okay, so when did you present this as a claim construction dispute that you think needed to be decided? So we certainly in pre-verdict JMAW briefing made it very clear, couldn't have been more clear, that the term was not limited to directly sending. But that it also accommodated, as disclosed in the intrinsic evidence, an intermediate server between the accused server and the EDS or EIA. Now, I want to go back to what I was saying about why it was an evolving issue. And it wasn't even clear that we had, before the jury was charged, that we had a dispute on infringement on this issue. And the reason I say that is both sides' experts agreed that there's no directly limitation in the claim language. And they both agreed that the claim language accommodates an intermediate server. On the one hand, it was Mr. Colburn on infringement. On the other hand, it was defendant's witness, Mr. Antonoff, for his invalidity opinions. And he said it twice. Mr. Antonoff, he said it on direct examination. And he said it on my cross, because I wanted to be clear. Do we have, are the experts disagreeing on this? We would have had an O2 micro issue in front of the jury if we had expert disagreement. But we didn't. What is your JA's support for where there's expert agreement on this issue? So I would cite, Your Honor, to Appendix 6662, Appendix 7200 to 7201, and Appendix 7253 to 7254. What do they say? Because you don't have enough time to look at all those pages. Yes, Your Honor. So I asked on, I asked Mr. Colburn, who was cell trust expert. I said, do you see directly limitation in the claim? Defendant's objective, actually, and presumably because it was a, they perceived it as a claim construction issue, district court judge overruled their objection in front of the jury. This was not a sidebar. And then he went on to say, essentially, you know, the accused server has to be, the claim server has to be facilitating the communication to the EDS EIA. So all that taken into context and the way he, and the way the evidence came in, certainly an intermediate server was not precluded by the claim language. And then on, and then I'll just say, just to add to your question about Mr. Antonoff for the defendants, he basically said twice, he said, plaintiff's expert said a beautiful thing. It was interesting, colorful language. He said a beautiful thing. There's no directly or direct limitation. And so it doesn't matter if it goes through intermediate servers. As long as it ends up at the EDS or EIA. So the jury says non-infringement. Yes. So without getting a jury instruction by the district court saying you can't, it's only directly, it's not indirectly. So what do you do that? You, what's your complaint on J Maul is that it's completely against the weight of the evidence because it was infringement because of it. So we're going to do the infringement thing based on a claim construction that you didn't ask for? Your Honor, it's, so what happened was the jury, we didn't know this was a dispute on non-infringement. The first time, because Mr. Antonoff did not give an opinion, defendant's expert never said, there's no, you know, there's no infringement because it's not directly sending, there's no, there's an intermediate server, never gave that opinion. So how do we know what the jury did, why they reached a conclusion on infringement? It was the only argument that defendants made in closing. And so that's the first time the jury hears this is a non-infringement argument. It's the very first time. Defendants closing, attorney argument. Did you make an objection? Your Honor, there was no objection. There was no objection in closing. Frankly, the way that the trial was playing out with the judges overruling the objection in our case in chief that I mentioned earlier, there was no indication from the district court judge that she would find a direct limitation. And so is your position that there was no error in the submission of the case to the jury? The only error occurred later when she wrote the J-ball opinion? I would say it was error because that was the first time the judge told us that there's a direct limitation was post-verdict J-ball briefing. I would say it was error if the judge charged the jury with that view in mind. But she didn't charge the jury. There's no objection to anything in her charge to the jury by you, is there? There is not because we perceived it as still a plain meaning issue, plain meaning claim term. And that's what you're arguing now? Yes. And the only evidence that the jury heard was that without a charge from the district court was there's no directly limitation in this claim and intermediate servers are allowed. So that's all the evidence the jury had. So our argument is even if putting aside whether there was an error in charging the jury, by construing the claim this way post-verdict, it's not a weight of the need for you to object. I mean, you said earlier on this wasn't an 0-2 micro issue. Well, maybe it was if you had raised it to the judge and it had come up over an objection where you would ask for a jury instruction. Yeah, and we had no notice. All of that happened before the defendant's closing. So the evidence went in, jury instructions were begged, and then the closing argument comes in. But why is there a waiver if you didn't object, as Judge Andrews indicated, to the closing? I know it's unusual to object to a closing, but if you have something you think that's prejudicial happening in the closing, I think the onus is on you to object. Your Honor, we thought that with pre-verdict briefing, JMAW briefing, and post-verdict JMAW briefing, that the judge was going to take care of this as a matter of law because it's a claim construction issue. And we thought that the judge was going to take care of it. All right. Can we move on to corroboration just because your time is moving forward? Use of corroboration in the context of this case seems really unusual to me. Usually we have corroboration come up in completely different contexts, but not in terms of a witness testifying in obviousness. And as testified, Monique, putting together the obviousness case was quite specific. So there's one mention at the end about using the devices, and you're using that as a whole basis, corroboration. I've never seen a case quite like this, to use corroboration against an expert witness who had very fulsome testimony that seems perfectly appropriate on obviousness. Understood, Your Honor. I think that you can see in the case law, I think, that the issue of corroboration doesn't – I don't think it comes up often in the obviousness context. And it's probably even rarer that it comes up in the context of obviousness where the factual testimony is coming in from the expert witness. Yes. I mean, you say it's rare. Do we have any cases where it was an expert witness in an obvious situation? I have not seen that, Your Honor. Okay. Well, maybe there's a reason for that, but I don't know. So go ahead. Yes, Your Honor. Understood. And so, yes. So we were – both sides were bringing together other case laws to kind of round out the view of corroboration in this area. What happened at trial was the defendant's expert, Mr. Antonoff, when he testified, he testified there were two bases for his invalidity opinions, obviousness opinions only, both based on this combination of Google – three Google products. And there was no documentary evidence that they worked together. The only documentary evidence in the record was that not – they didn't all work together. There were two of those three products that did not integrate with each other, Google Voice and Google Vault. All this comes out in his cross-examination. And so there's – and he admits on cross-examination that he's offered no evidence to the jury to corroborate his personal use. Can you give us the J-8 pages for where you think these omissions lie? Yes, Your Honor. Bear with me for one second here. Let's see. So – okay. Okay, so the most poignant example, Your Honor, of that admission is at Appendix 7260. Yeah, that's what I'm looking at because going through the whole testimony, I thought that was the only thing you must be talking about. And, of course, that's preceded by lots of direct testimony about how he arrived at his obviousness determination. Very routine, very standard. Yeah. So here you say, turn to another topic. You've offered no evidence other than your own testimony of your personal use of Google products, right, sir? And the answer is, there's plenty of evidence cited in my report that supports my testimony. And then he said, to this jury, you offered no evidence about your own personal use. And he says, correct. That's it. Your Honor, I understand. So there were other – actually, there were other questions on cross-examination where I went through and rounded it out with, okay, you haven't introduced any Google documents. You haven't – to show this personal use, you haven't shown any documentation of this, you know, this system that you say you put together. Nobody else has testified to this. And he agreed to all those things. And that's in our briefing. I don't have the site at the moment, Your Honor, for all of those record sites. But he testified around all of that. The issue with the corroboration here is the way we look at this is we didn't have – because Mr. Antonoff didn't come forward with any corroborating evidence, documentary evidence, there was really no basis to cross-examine him on what that system was. So then we were left with, okay, there should be at least some constraint on his ability to talk about how, you know, how those things work together. Is he testifying in two capacities, one in terms of some limited personal knowledge but also as an expert? Is he testifying in those two capacities? Yes, Your Honor. He was. So you had a basis to cross-examine him at a bare minimum as an expert. Yeah, but the core issue was whether those products could actually be combined to work together. And the only evidence was that they were not, could not. In fact, the Google Voice and Google Vault couldn't be combined until 2020. Well, after the 2013 crisis. Did you have testimony about that? Because I thought your testimony for your expert, Mr. Coburn, was very, very, very thick. He said, if you put the code in front of you, would you be able to read it in any language? Again, probably not. I'm an executive at this point. Can we agree you don't know for certain how data communications were sent? Blah, blah, blah. I've not looked at the customers and how they have integrated. So the answer is true. You just don't know. I don't know. But that's my testimony. And I do have actually testimony to cite to you from cross-examination of Mr. Antonoff. And it's at Appendix 7234 to 7235. And this was a cross-examination where the judge had to admonish him to answer questions straightforward. And here he admits, yes, Google Vault and Google Voice did not work together until 2020. So whatever he did in terms of personal use must have been some, if we are to believe him, some alteration of how those products could work together. There's nothing else on that point. Your time's almost up. And I just have a kind of a technical question. And this is about, and I think you raised it in your brief, the court's judgment talked about patents and not the claims. Yes, Your Honor. OK. Did you go back to the district court and ask for clarification or some fix to that? Your Honor, I don't believe we did. Why not? We filed the notice of appeal timely, and we included this issue in there. And we understood this court could render a judgment to confirm that not all the claims were visited on the district court. And so that's it. In your view, what is it necessary that we do in order to remedy this? Your Honor, I think that the record's clear. I mean, obviously, it could be clear with a statement from this court, and I see my time is up. I'm going to have to rest on our briefs on the Section 101 issue. Let me just ask you one quick question. Did you get your question answered? No, I'd like you to follow up on it. I can't. What do you want us to do? Do you think it's sufficient for us to say in an opinion and drop a footnote and say, hey, by the way, the district court got it wrong? I think that's sufficient, Your Honor. I mean, it's not a substantive error. It's harmless. It's just a technical one. Thank you, Your Honor. The only other question I have for you is you have potentially a pending motion for judicial notice? Yes. What effect of anything would that motion have on this case? Do we actually need to decide that? I don't think that it's necessary to reach the conclusions we're asking for, the relief we're asking for. But it is certainly informative record evidence, intrinsic evidence with respect to a number of issues that we pointed out. But as I said, Your Honor, it's— It doesn't affect anything here, so it's essentially moot. Would you agree? I agree, Your Honor. Okay. All right. Let's hear from the other side, and we'll restore some of the audit time. Good morning. Mr. Arendt? Yes. Good morning. May it please the court, counsel, I'm here for the appellee, my rep, Chad, as well as individuals Derrick and Wade Gerard. This is a simple appeal. Can I start you on this, just to clean up this technical issue we have, not on judicial notice, but on the— to Blu on this point, that there does seem to be an error, harmless as it may be, in terms of the district court's judgment order. Do you agree with that? I think we did cite a case, the Nuance case, which also refers to the Katz case. The district court would have the authority to enter judgment on an entire patent when the plaintiff or patent owner has winnowed down its claims voluntarily throughout the case. So I think that the district court judge had the authority to— But you're not disagreeing with us that it's a subset of claims that really should be listed in the judgment, are you? I would say that's what I would typically expect to see in a judgment. I think when you— But you have no issue with us potentially fixing that via a footnote, kind of what Judge Post laid out, right? That's not a hill I'm going to die on. You have no issue with it. I agree it's not a hill you want to die on, but you have no issue with it? I would just say that the Nuance—this issue did arise in Nuance, and the district court judgment was affirmed for the judgment of the entire patent, even though a subset of claims were tried. So you're asking us to affirm the invalidity of the entire patent beyond the claims that were asserted in this case, really? I have overstepped. Not a hill I want to die on. I will agree with your honors. Thank you. So can you talk to us about this so-called plain construction, direct and indirect? Because it does seem the judge in the JMAL did seem to say, yeah, I think it needs to be direct. It feels on infringement because it needs to be direct. Are you reading it that way, too? The plain meaning applied to these claims, and the district court in their JMAL decision said just that. And first of all— Yeah, but he said more than that, right? I mean, he did say that. You're right. But didn't he also say, based on the plain meaning of—I'm going to read Appendix 19. Based on the plain meaning of sending and the absence of express directly limitation, the court concludes that the asserted claims are not infringed if an intermediate third-party server sender sends communications to the EDS rather than directly to the accused MIRA chat server. Which is exactly what the plain language of the claims say, because there's an element that talks about a server, so we could have more than one server, receives the communication. And then the next element is the server. So we have the same server that received the communication is now the server that is configured for sending to an electronic discovery system. So we have exactly what going to where. And this—what is also on the next page of that appendix, Your Honor, on Appendix 20, is Judge Wright saying, this has been disputed the whole case. So she says this conclusion—let me read the sentence first. The court agrees that the claims— Where are you on the page? You're on page 20? I'm on page 20. I don't—I have only an excerpt in my notes. Okay. But it reads, the court agrees that the claims require direct sending from the MIRA chat server to the EDS EAIS. This conclusion is consistent with defendant's position in their non-infringement intentions throughout the case. So this was a disputed issue. And it's waived. If there was any sort of claim construction issue that CELTRUST wanted to raise, it was incumbent on them to do so before the jury was charged. And they didn't do it. In their brief—you know, here, today, we heard an argument that, oh, they didn't hear about this until closing argument. But in their briefing to the court, the argument was, we preserved it through an oral JMAL motion, which would have predated any sort of closing arguments. So there's some inconsistency to it. But when you look at what the district court did, she found exactly what happened, which is this was the disputed limitation. This was the only non-infringement limitation in dispute in the entire case for the defendants. And it was the plain meaning. And Judge Wright construed 13 separate claims. She construed every claim that— So can I be contending that the other party and the courts would have first been on notice that there was an argument you were making under the plain ordering meaning in terms of direct sending? When did that first become apparent or should have been apparent to self-trust? Well, certainly throughout the entire trial. Is that the earliest it became apparent? She talks about your non-infringement contentions. So in the District of Minnesota, we do have a prior art statement and then responsive infringement contentions. And there is infringement contentions that dispute that limitation. The non-infringement contentions that you were— Yes. Okay. Yes. Does the judge have to do anything in response to these non-infringement contentions? I mean, people have contentions all the time that I as a district judge have no idea they're making. Exactly. I don't even think they're filed with the court. They're a disclosure opportunity for the parties to kind of guide the process. And why I think that's relevant, Your Honor, is it was incumbent on self-trust to either raise during claim construction if it felt that there was any sort of issue. But certainly by the time of trial, to the extent it felt that there was a legal claim construction issue, it was incumbent on them to ask for a construction. And so maybe the question Judge Cunningham was asking, and if she wasn't, I'm asking, is when did the court first know that there was any kind of dispute here? At best, post-trial motions. I mean, I'm speculating on what the district court knew. But the first time this issue was— Well, I mean, where the record shows it being raised to the district judge. They pivoted to this as a post-trial strategy after they lost on the verdict. You didn't pivot the court on notice before post-trial motions? Is that what you're saying? I'm just trying to make sure I understand the answer to the question that was directly posed by Judge Andrews. We put our non-infringement theory on notice to the court. You're saying that what was known to the court all along and to everyone was your so-called direct theory of infringement, and they only raised the concern? Is that what you're saying? Yes, because this was submitted as a factual dispute to the jury. And when you look at Apple versus Samsung, the case couldn't be more clear. It was about configured to synchronize. And at trial, there was a factual dispute about whether there was direct or indirect synchronization. And the jury came back with non-infringement. So post-trial, Apple said, hey, we want this construed to include indirect synchronization. And the district court said, no, this was submitted as a factual matter. You waived any claim construction issue, and this court affirmed that judgment. So was this in the pretrial order? I'm just still trying to understand when the court itself, the district court judge, would have first been made aware that this was really the argument being made. The court was aware in the pretrial aspects that we were disputing this limitation. And so can you tell me, like, do you have a JA page for me? Is it in the pretrial order? How can I confirm what you just said is accurate? I don't have a JA page at my fingertips, Your Honor. What is tricky about it is it's not, to us, it's not a claim construction issue at all. And so there was no claim construction issue raised to the court. And I can try and find in my notes quickly maybe the non-infringement contention. I'm going to struggle to do that efficiently. You can keep going. I was just trying to get an answer on that one. But what we made clear is that there is one limitation in these claims that we disputed for non-infringement purposes. And I don't want to mislead Your Honor in suggesting that there was an argument as to how that was going to be contested. I don't think any defendant has a burden to do that. But usually, I mean, correct me if I'm wrong, and I know Judge Andrews is very familiar with this. I thought typically, at least when I practiced, you would pick, you'd make sure all the issues that you want to be tried by the court are going to be clear in the pretrial order so there's no doubt about the scope. Was a similar sort of exercise done during the course of this case? So we do have a pretrial order. We do have a trial brief.  And I can— And just off of your memory, was this made clear in one of those sort of vehicles or documents? I don't have that level of specificity in my mind. But the witnesses test—the witnesses that you had testifying about infringement and non-infringement were talking about this. What we're talking about, right? How this operates and that it's intermediary and so forth. Exactly. And what is really important on the infringement side is that there was a complete implosion by their—and a complete failure of proof. And that's how this court should affirm this judgment, too. It was their burden to prove infringement. And their expert imploded. He's not even an expert, frankly, for that matter, based on his qualifications. He didn't look at any code. He didn't look at any configurations. Is this Mr. Colburn? This is Mr. Colburn. And so to the extent they're trying to make this into a claim construction issue, our position is it's waived. It was a factual issue submitted to the jury and the jury rejected their case. You want to turn briefly to corroboration? I do. But even before that, Your Honor, if I may, there are two bases to affirm on obviousness. And the simplest path to affirm on obviousness, I think both of them are strong, but Attenasio is a published patent application that discloses every single element except virtual communications. Virtual communications were well known in the art. Their applicant admitted prior art at column 549 to 52 and column 611 to 20 of the 012 patent. And even their own inventors admitted virtual communications, something that they didn't admit. The verdict form didn't require the jury to pick one set of obvious combination or the other, right? It was just a general obviousness verdict? Correct, by each claim. And because of it, and also in terms of the factual record, Mr. Antonov explained, Attenasio discloses the collection of all communications. And so while there's not an explicit reference to communications with the virtual number, it would have encompassed that. And so that record, the jury was properly instructed on obviousness, that Attenasio is everything but a virtual number. It's an applicant admitted prior art. The jury, that's substantial evidence for the jury to find obviousness. Now, and that's before you even get into non-infringement, before you get into corroboration. As far as a separate basis is this issue of the Google prior art. And with the Google products, Mr. Antonov is a disinterested witness. Your Honor, you're spot on. We have not found a single case where this has ever applied to an expert witness in an obviousness context before. You see, what I see in the case law are interference proceedings or some sort of dispute where there is another inventor, whether associated with the party or a third party, coming into court and saying, no, this is my invention. I did it first. And of course, you know, what we see in the case law is there are some reasons that courts might be skeptical of that. And that's why we would require corroboration. None of those policy considerations apply here. And when you read Thompson, Judge Rich had it right. He said corroboration wouldn't apply in this type of situation. And that, we submit, is binding precedent on the court in any event. However, even if the court were to require corroboration, we have the Gartner Report, which talks about integrating Google content without exclusion with Google Vault. We have multiple witnesses, Mr. Derek Gerrard, as well as Brian Coey, who are fact witnesses who testified about Google Voice and the existence and the features of that. And we had Mr. Colburn, who, because keep in mind, corroboration can be met with circumstantial evidence as well. And Mr. Colburn, who had a tough day on infringement when he testified, and he also had a tough day when he tried to rebut invalidity, he came in and said, well, let me step back. The only reason this is even, you know, an issue they could put in a brief is because the district court, we submit, erroneously excluded dozens of exhibits that corroborate every single thing that Mr. Antonoff said. And we submit that was error. It was a hearsay ruling, which doesn't comply with this court's precedent. We did not appeal it. We didn't appeal it because we have a complete judgment in our favor. But the point being, there is a strong documentary record that corroborates this. On cross-examination, Mr. Colburn said he read all those documents, but he didn't consider them for purposes of his report. And that's circumstantial evidence that the only way he could even get on the stand and even say anything that he was offering for non-obviousness was because he was turning a blind eye to even considering this evidence. So what is your response to what I thought I also was hearing from opposing counsel, was that there was a lack of documentary evidence put in to support up the obviousness case? Like, can you speak more to that? He was trying to identify what he thought were some omissions that he was getting out of your expert in this regard. Well, again, it's the byproduct of an erroneous exclusion of over a dozen articles that Mr. Antonoff's expert report is supported by that detail the features and corroborate the features of the Google products. What I think my friend was saying on the other side was that Mr. Antonoff's personal use of these features, and I can get into exactly how he did that if you'd like, that there is not a particular document for at his company. But that's not Mr. Antonoff's role. He was giving that as an example. He was talking, again, about an obviousness combination based on his experience and his unrebutted expertise as a software engineer in this field. But, Your Honor, what I'd also come back to is the Gartner report, and that's at Appendix 829293, is documentary evidence. I see that I'm past my time.  Thank you, Your Honor. Will we store three minutes of rebuttal? Great. Thank you, Your Honor. Appreciate the additional time. I want to address this issue of, like, how the claim construction for sending developed, to go back to that, just to address some of the counsel's comments. The issue, we're conflating two issues. The argument that they were making in contentions was, their servers in the default configuration are not configured to do anything, including sending. That's a different issue from, okay, when they are, because they're not in the default configuration. Their witness, CEO Derek Gerrard, testified to all this. They have these three instances, and all the demonstrators are in the record before Your Honors. They're not in the default configuration. You can see that from their admissions. They talked about 100% of their customers, 75% going through an intermediate server, 25% using the API. That's direct. It's direct. It's not, there's no intermediate server there. They put in the evidence that shows that they're sending. Under the correct claim construction. That's a different issue from this, and their expert when he testified on non-infringement, all he said was, all he said was, our servers, the MRC servers in their default configuration, are not configured to do these things. What about the non-infringement contentions that opposing counsel said identified this issue? Yes, Your Honor. Did they identify this issue? Not the sending. Not the directly. To correct that on the record here. It wasn't the directly issue in the infringement contentions. It was the configured, the default configuration issue. I could see how those would get conflated, but they can't be. They're different issues. So this issue did not, this directly issue, was not present before trial. They started putting in evidence during trial with their witnesses, showing their, you know, the intermediate server or not, with the API that goes directly. And, you know, so I ask our expert, is directly limitation, he says no, over their objection in front of the jury. Then their expert gets up, and I don't know why. He said this without prompting me, but he said on direct examination, I agree. There's no directly limitation here. So it doesn't matter if it goes to intermediate servers. It gets there. As long as it gets there. That's the record we had. That's the record we had going into jury instructions. That's the record we had going into closings. So the very first time, the very first time that there was an argument on this directly limitation was in their closing. The very first time. And the very first time that we hear from the judge that the judge is inclined to agree is post-trial motions. In pretrial motions, in pre-verdict motions, JMAW motions, we said repeatedly there's no directly limitation because we weren't sure what they were going to do with it. Thank you, Your Honors. Thank you. We thank both sides. The case is submitted.